**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION**

| | |
|---|---|
| CARL DUKES, ET AL., | : |
| Plaintiff, | : |
| vs. | : 1:04-CV-47 (WLS) |
| MERCK & CO., INC., | : |
| Defendant. | : |

## ORDER

Presently pending before this Court is Defendant's motion for summary judgment. (Doc. No. 31). For the following reasons, Defendant's motion for summary judgment (Doc. No. 31) is **GRANTED-IN-PART and DENIED-IN-PART.**

## BACKGROUND

Plaintiffs, Carl Dukes ("Dukes") and Hartzell Hayes ("Hayes"), both African-American, began their employment with Defendant in 1986 and 1981, respectively. After more than ten years of employment, in 1998, Plaintiffs filed charges of race discrimination with the EEOC. Soon afterwards, Plaintiffs joined a class action discrimination suit, as named Plaintiffs, against Defendant, entitled <u>Cabell et. al. V. Merck & Co., Inc.</u>, Civil Action No.: 01-CV-1005 ("Cabell"). The <u>Cabell</u> case was originally filed in this Court in 2000 and re-filed in the United States District Court for the Eastern District of Pennsylvania.

## FACTS

Merck is a company, headquartered in Whitehouse Station, NJ, that produces human and animal health producst and services. Plaintiffs Dukes and Hayes were at all relevant times employed at the Merck plant in Albany, GA, known as the Flint River Plant ("Flint River").

According to Merck, the company is committed to providing equal employment opportunity to all applicants and employees and is committed to maintaining a work

1

environment free from all types of discrimination and harassment.  Merck allegedly provides its employees with its equal employment opportunity and non-discrimination policies.  These policies were in place during all time relevant to the facts of this case.  Further Merck has a progressive disciplinary policy for hourly employees.  First the employee is given a verbal warning.  Should that fail the employee is placed on a formal performance improvement plan or PIP.

### A. Dukes' Employment

Dukes began employment with Merck in August 1986 at Flint River as a Quality Control Analyst.  At the time of his termination in September 2003, Dukes was a Senior Environmental Laboratory Analyst dealing with water quality and water quality compliance.  Duke was supervised by Environmental Water Laboratory Supervisor John Fondren (caucasian) until September 1, 2001.  After that date Dukes was supervised by Patricia Johnson (caucasian).  Johnson was Dukes' direct supervisor until he was terminated.

Stacey Starkman (caucasian) was Dukes' second level supervisor beginning in 1999.  Starkman was his second level supervisor from 1999 through the termination of Dukes' employment in 2003.  There was a brief period of time in 1999 where Starkman was Dukes' primary supervisor.

Starkman, along with Human Resources Manager Mike Wilson (African-American) and Johnson, made the decisions to place Dukes on Performance Improvement Plan ("PIP") in March 2003, and the decision to terminate his employment with Merck in September 2003.

In the fall of 2001, the Flint River facility went through a lay-off and reorganization.  Of the employees not laid off, some were required to accept a change in job title or position.  Duke's Senior Staff Environmental Engineer position was eliminated during the reorganization.  Dukes' job title was changed from Senior Staff Environmental Engineer, salary grade 7, to Senior Environmental Laboratory Analyst on November 1, 2001.  Even with the change, Dukes remained in the same department and kept the same salary grade.

On March 17, 2002, Dukes' 2002 yearly performance appraisal was reviewed with

him. It is undisputed that Johnson participated in preparing the review and Dukes alleges that Starkman, also assisted in preparing the review. The appraisal noted various deficiencies, including poor quality of work, poor communication, and misrepresentation of work performance.

Dukes was surprised at the performance appraisal. Dukes testified that he remembered Johnson commenting on the high quality of work performed by the department during the year in question. Duke believes that the problems attributed to him were not discovered until an audit of the Department in February or March 2003, even though he admits the error occurred in 2002. After receiving the review, Dukes provided written comments to the review.

According to Starkman began to notice problems with Dukes' performance near the end of 2001. Starkman and Johnson allegedly discussed with Dukes on several occasions his performance deficiencies and saw no improvement. Starkman believed that Dukes leadership skills were lacking. During that period, Starkman observed that Dukes failed to communicate with supervisors in a timely manner concerning problems, failed to set workload priorities, failed to follow through with commitments and had a tendency to blame others for his mistakes.

Of much greater concern to Starkman and Johnson in March 2003 were the result of the audit of lab data for which Dukes was responsible for second-person review. The audit revealed that Dukes failed to find 84 errors in the data and that Dukes signed off on the data indicating that it was correct. The audit created a serious issue for Merck and required the Company to report the errors to the Georgia Environmental Protection Department. It also required Merck to resubmit data for the years 2000, 2001, and 2002. For the years of 2000 and 2001, Merck discovered 200 errors that Duke was responsible for catching, but failed to do so.

On March 28, 2003, Dukes was placed on a four-month PIP by Starkman and Johnson. The PIP was set to expire on August 6, 2003. In a meeting that lasted approximately an hour and a half, Dukes went over the PIP with Starkman and Johnson. The PIP identified three

areas that needed improvement, they were "(1) quality of work, (2) communication, and (3) dependability/communication of tasks." The PIP also contained a notation that the same issues had been raised with Dukes on February 14, 2003, and during his 2002 review held on March 5, 2003. Dukes admits being counseled about his performance on those dates.

While acknowledging the errors were his responsibility, Dukes disputes they were the result of misconduct on his behalf. He maintains that mistakes in catching the errors was the result of his backlog of work. It is not clear what Dukes blames this backlog on.

Dukes also received criticism for failing to properly update the operations manual. It is unclear whether this criticism was done formally or informally. Dukes was given the requirements for completing the task in October 2002. From November 1, 2002, through December 10, 2002, Dukes was asked about the status of the manual by Johnson. Dukes said that he was working on it. Dukes admits that from Johnson's perspective, the manual was not completed in a timely manner.

In addition to the four month PIP period, the PIP contained the following statement, "Any further mistake that is not caught by your second-person review, but found on review of your work will be grounds for immediate dismissal." Dukes' performance during the four month PIP was inconsistent. By July 2003, Starkman noticed a deterioration in Dukes' work performance. Effective August 12, 2003, it was decided to extend Dukes' PIP an additional 90 days. Dukes' work performance became unacceptable within a matter of days of the PIP extension.

Sometime in August 2003, it was discovered that Dukes failed to discover seven errors during second-person review of the data coming out of the laboratory. As noted above, the PIP called for immediate termination for failure to detect any errors during the review process. On August 27, 2003, Johnson formally requested from Starkman that Dukes be terminated. Johnson, Starkman and HR Supervisor Wilson reviewed Dukes' performance and decided to recommend termination. Merck decided to terminate Dukes employment effective September 8, 2003.

In his written response to his 2002 performance review, Dukes made no mention of race discrimination or retaliation. Likewise, Dukes did mention in writing or orally that his evaluation was retaliatory for providing an affidavit in support of a TRO related to document retention requested by the Plaintiffs in the Cabell case. Dukes was aware that Merck had in place policies and procedure for reporting alleged employment discrimination. Further, Dukes did not know whether Johnson or Starkman were aware of the Cabell lawsuit or his involvement in it. Dukes did state that he did not complain because he planned on filing a charge of discrimination with the EEOC and that he was not confident in the internal reporting system.

In his charge of discrimination with the EEOC, filed on May 14, 2003, before he was terminated, Dukes alleged race discrimination and retaliation. Dukes stated that his allegations were continuing and gave a beginning date of March 28, 2003. Dukes alleges he was discriminated and retaliated against for providing favorable affidavits in the support of the Plaintiffs' motion for a TRO in the Cabell case. As evidence of racial discrimination at Merck he admits to hearing from a fellow Cabell Plaintiff about racial slurs made over the radio. Dukes supplemented his charge of discrimination on October 23, 2003 to add the fact of his termination and to add that his placement in the PIP was a change in a term of his employment.

**B. Hayes' Employment**

Hartzell Hayes was employed by Merk at the Flint River plant from 1981 until his retirement on July 1, 2003. Hayes had numerous supervisors during his employment at Merck, to include, Brady Lee (caucasian)- from 1981 to about 1986, Jerry Corbin (causasian)- sometime in 1997, and Mike Velez (race unspecified)-from 1997 to sometime in 2002. After these three supervisors, Hayes was supervised by Brian Naftel (caucasian). Naftel was transferred to the plant on or about July 8, 2002, as Utilities Waste Treatment Manager or Department Manager. Naftel's supervisor was Dan Hoey, Site Manager and hiring manager at the plant. Naftel only spoke to Velez briefly about gas and electricity prices for 2003. Naftel

5

never spoke to Velez about Hayes.

According to Hayes he complained to his various supervisors over the years about certain activities as the plant, his salary and grade level. Hayes claims that the various acts are evidence that he was subject to racial discrimination.

Hayes claims that Brady Lee, Hayes' first supervisor, discriminated against him. According to Hayes, he complained to Lee's supervisor, Dan Clarke, about Lee's treatment. In response to a performance evaluation of Hayes' work by Lee, Hayes complained that Lee was harassing him, but Hayes did not call the harassment, at the time, racial in nature.

Hayes says that by 1987, he believed that Jerry Corbin, a subsequent supervisor was treating Hayes differently because of Hayes' race. In 1990, in response to performance evaluation, Hayes provided Corbin with three pages of comments. Hayes did not mention racial discrimination in those comments.

As for Naftel, Hayes also believed Naftel discriminated against him because of his race. Hayes points out that Naftel was more demanding and kept a closer eye on Hayes. Hayes also believed someone, possibly Naftel, changed entries Naftel made into the computer. Naftel also allegedly gave Hayes more work to do. Hayes also believed that Naftel was more critical of Hayes' job performance than his previous supervisors. In sum, Hayes believed that all of his supervisors wanted to fire him even though none ever did.

Hayes also believes that he was demoted by Lee on March 1, 1985. Even though Hayes alleges he was demoted, Hayes received a pay increase. Hayes admits, however, that none of his supervisors told him he was demoted.

As alluded to previously, just about every time that Hayes received a performance evaluation, Hayes disagreed with it. Most of the evaluations stated that Hayes needed to improve his planning and organization, clean up his work station, prioritize tasks, pay more attention to detail, reduce errors in written reports and utilize the computer more frequently. The criticisms Hayes received were consistent for the most part during the periods before and after he became involved in Cabell.

In July 2001, Hayes complained in response to his 2000 job performance review that Merck failed to promote or upgrade African-American males because of their race. The Site Operations Manager, Ned Winslow (caucasian) investigated Hayes' claim. Hayes refused to discuss the details of his claim with Winslow allegedly upon advice of Hayes' attorneys. It appears that Hayes job was upgraded to a level 12 as a result of the investigation. Hayes claims that the grade 12 was taken away from him by Naftel, even though the evidence indicates Hayes was a grade 12 when he retired.

Naftel states he became aware of the class action lawsuit about five months after he began supervising Hayes. According to Naftel, he found out about the lawsuit after discussing Hayes' poor job performance with Royce Inlow, Human Resources Manager. Naftel states that Inlow informed him about the lawsuit during his fifth conversation with Inlow about Hayes' job performance. As a result of Naftel's repeated conversations with the Human Resources staff, Naftel gave Hayes verbal counseling in addition to the annual written reviews.

On or about April 15, 2003, Naftel conducted Hayes' 2002 year-end review. Naftel explained to Hayes that his job performance was below expectations in a number of areas. Naftel explained that in addition to his own observations, he sought input on the performance evaluation from other departmental staff and from others outside the department. In addition to Naftel's observation, the others noticed that Hayes inadequately performed key tasks required of Hayes' job.

Because of these observed deficiencies, it was decided to place Hayes on a PIP. Hayes was placed in a PIP on April 23, 2003. Naftel kept detailed notes on Hayes' performance during the PIP period. Before Hayes retired, Naftel had not decided whether he would terminate Hayes' employment upon completion of the PIP period. Naftel noticed improvements in some and no improvement in other areas of Hayes' performance.

Soon after his 2002 review and being placed in a PIP, it appears Hayes approached the Human Resources Department about retiring from Merck. Hayes was sent, received and

submitted the required paper work to retire. On May 5, 2003, before the retirement was approved, Hayes approached Naftel and told him he was thinking about retiring. Hayes explained that he was retiring because his work load was too great. Naftel did not agree with Hayes' assessment, but agreed to look into the retirement request at their first PIP review meeting.

Hayes has since stated that he decided to retire because he believed he was going to be fired and that he would lose his pension. Hayes believed a recent hire, Audry Brown (African-American) had been brought in to take over some of Hayes' duties. Hayes also believed that his 2002 performance evaluation and subsequent placement in a PIP were indications of his eminent termination.

On October 15, 2003, Hayes filed his charge of discrimination, alleging race discrimination and retaliation, with the EEOC. In particular, Hayes apparently alleged as evidence of discrimination incidents involving a handicap parking tag, a bicycle Hayes used to travel around the plant, a security camera, a company credit card, and being forced into retirement. Hayes seems to indicate that he complained about race discrimination to Naftel.

## SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The Court is required to "resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his or her favor." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993) (quotations and citations omitted).

The moving party carries the initial burden of showing that there is an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). The substantive law governing the case determines which facts are material, and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). For issues on which the non-movant bears the burden of proof at trial, the moving party "simply may show—that is, point out to the district court—that there is an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case." Fitzpatrick, 2 F.3d at 1116 (quotations and citations omitted).

If the moving party fails to overcome this initial burden, the Court must deny the motion for summary judgment without considering any evidence, if any, presented by the non-moving party. Fitzpatrick, 2 F.3d at 1116. If, on the other hand, the moving party overcomes this initial burden, then the non-moving party must show the existence of a genuine issue of material fact that remains to be resolved at trial. Id. Moreover, the adverse party may not respond to the motion for summary judgment by summarily denying the allegations set forth by the moving party. Rather, the adverse party "must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(e).

## DISCUSSION

Plaintiffs bring this employment discrimination complaint, based on race, and retaliation against Defendant pursuant to Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e *et. seq.*, and 42 U.S.C. § 1981. Defendant argues that it is entitled to summary judgment on all of Plaintiffs' claims. Defendant argues that (1) Dukes' claims for discrimination under Title VII arising prior to November 15, 2002, are time-barred; (2) Hayes' claims for discrimination under Title VII arising prior to April 17, 2003, are time-barred; (3) Dukes' and Hayes' various discrimination claims fail as a matter of law; and, (4) Dukes' and Hayes' retaliation claims fail as a matter of law.

### I.  STATUTE OF LIMITATIONS

Merck argues that certain claims in relation to alleged discriminatory treatment of

9

Plaintiffs are barred by the applicable Title VII 180 day administrative statute of limitations. Title VII requires a claimant to file a charge of discrimination within 180 days after the alleged wrongful employment practice occurred. 42 U.S.C. § 2000e-5(e)(1); Zipes v. Trans World Airlines, 455 U.S. 385 (1982). Therefore, any claim for discrimination under Title VII that occurred more than 180 days prior to the filing of the charge is barred.

Even so, Defendant acknowledges that a "continuing violation" of Title VII constitutes a tolling of the limitations period. City of Hialeah, Fla. v. Rojas, 311 F.3d 1096 (11th Cir. 2002). Plaintiffs argue that the discrete acts complained of are evidence of a continuing violation of Title VII. Further, while making the argument, Defendant is less than forceful and clear as to which alleged acts of discrimination are barred by the Title VII statue of limitations.[1] Therefore, having failed to meet its initial burden under the rules, Defendant's motion for summary judgment on Plaintiffs' Title VII claims based on the running of the Title VII statute of limitations (Doc. No. 31) is **DENIED.**

## II.  HAYES' CLAIMS OF DISCRIMINATION

Defendant argues that it is entitled to summary judgment on all of Hayes claims of discrimination. It appears that Hayes makes claims of hostile work environment and constructive discharge.

### A. Hostile Work Environment

Plaintiff Hayes makes a claim for hostile work environment. To establish a *prima facie* case of hostile work environment, a plaintiff must show: (1) that he or she belongs to a protected group; (2) that he or she has been subjected to unwelcome racial (or sexual)

---

[1]. Defendant may also be arguing that certain alleged wrongful acts are barred by the statute of limitations governed by 42 U.S.C. § 1981. Defendant seems to argue that § 1981 has two statutes of limitations, two years and four years, and that certain alleged acts are barred by the two year statute of limitations. The argument is raised in passing and not with any particularity. Therefore, to the extent the argument is raised, Defendant's motion for summary judgement based on the running of the statute of limitations pursuant to 42 U.S.C. § 1981 (Doc. No. 31) is **DENIED** in that Defendant has not met its initial burden in that regard.

harassment; (3) that the harassment was based on race (or sex); (4) that the harassment was sufficiently severe and pervasive to alter the terms and conditions of employment and create an abusive working environment; and (5) a basis for holding the employer liable. Johnson v. Booker T. Washington Broadcasting Service, Inc., 234 F.3d 501, 508 (11th Cir. 2000).

In the present case the only real disputed elements are whether "the actions of the defendants altered the condition of the workplace, creating an objectively abusive and hostile atmosphere." Edwards v. Wallace Community College, 49 F.3d 1517, 1521 (11th Cir. 1995). Defendant maintains that Hayes cannot establish a *prima facie* case.

Defendant argues that none of the incidents complained of are objectively related to race. Among other things, Hayes points to the following incidents of racial harassment: (1) co-workers repeatedly asked Hayes when he was going to retire; (2) that several co-workers moved the bike he used for traveling around the plant; (3) that he was not allowed to park in the handicap parking space; (3) that his supervisors made it difficult for him to obtain a company credit card; (4) that he was placed in a PIP; and, (5) that a security camera was placed in his work area and comments were made about the camera being there.

Defendant maintains that even if all these actions constituted harassment, they were not based on race. As has often been said by the Eleventh Circuit, the federal anti-discrimination laws are not a "civility code." Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999). Mere teasing between employees and employers does not alter the terms and conditions of employment. Mendoza, 195 F.3d at 1245. For harassment to be so severe as to effect the terms and conditions of employment, the Plaintiff must show that a reasonable person in the same environment would find that it created an abusive environment. As the Eleventh Circuit summarized:

> The environment must be one that "a reasonable person would find hostile or abusive" and that "the victim ... subjectively perceive[s] ... to be abusive."*Id.* at 21, 114 S.Ct. 367. Furthermore, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.' " *Oncale,* 118 S.Ct. at 1003 (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. 367).

11

Id. at 1256.

Numerous cases involving allegedly more egregious and also intermittent conduct have been found not to be racially or sexually harassing. Barrow v. Ga Pacific Corp., 144 Fed.Appx. 54, 2005 WL 1926420 (11th Cir. 2005)(display of rebel flag on tool boxes and hard hats, the letters "KKK" on the bathroom wall, a noose in one employees locker, one employee being called a "nigger" three times in one year, among other incidents, which occurred over a 14 year period was offensive but was not do severe and prevalent as to constitute a hostile work environment). In another case, the District Court found that racial graffiti, "KKK" initials drawn on certain packets and racially derogatory comments made to plaintiff were insufficient to establish a hostile work environment. Mitchell v. Carrier Corp., 954 F.Supp. 1568, 1577 (M.D. Ga. 1995).

The Court finds that the actions complained of by Hayes show little or no nexus between the acts and Plaintiff's status as an African-American. The facts show that Hayes' performed his job below standard for a number of years and did not raise the issue of race until the latter few months or years of his employment. While he may have subjectively concluded the jokes he incurred at his expense and the fact he was placed in a PIP were based on racial animus, no reasonable person could make such a conclusion given the undisputed totality of the circumstances. Hayes has failed to set out a *prima facie* case of hostile work environment discrimination. Therefore, Defendant's motion for summary judgment on Hayes claim of hostile work environment (Doc. No. 31) is **GRANTED.**[2]

### B. HAYES'S RETALIATION CLAIM

Hayes has also asserted a claim for retaliation under Title VII and 42 U.S.C. § 1981.

---

[2]. Defendant also argues that Hayes' claim is barred because he failed to use internal reporting procedures. The Court does not address this issue as Plaintiff failed to establish a *prima facie* hostile work environment claim. The Court does note that Hayes, in the later stages of his employment appears to have at least communicated his beliefs to one or more supervisors.

Defendant has moved for summary judgment on this claim.

To establish a *prima facie* case of retaliation, a plaintiff must show that (1) he engaged in protected speech; (2) he suffered an adverse employment action; and (3) there is a causal or temporal relationship between the two events. Pennington v. City of Huntsville, 261 F.3d 1262 (11th Cir. 2001).  Once Plaintiff has established a *prima facie* case,  Defendant must provide a legitimate, nondiscriminatory reason for its actions.  In order to prevail, the burden shifts to Plaintiff to show that the proffered nondiscriminatory reason was a mere pretext for discrimination.  Silvera v. Orange County School Board, 244 F.3d 1253 (11th Cir. 2001).

Merck does not concede that Hayes has established a *prima facie* case.  Defendant also argues that because Hayes cannot prove his constructive discharge claim-which the Court will address later-Hayes suffered no adverse employment action.  Merck simply glosses over the facts concerning Hayes' alleged protected conduct, who and when certain supervisors knew about it and the proximate time relationship between the knowledge and any of the acts complained of by Hayes.  This in and of itself is insufficient to warrant summary judgment in Merck's favor on the claim.

Even so, the Court will address whether Hayes has established a *prima facie* case of discrimination.  The parties all agree that Hayes is a participant in the Cabell class action suit. Whether his involvement was as extensive as that of Dukes in not made clear by the parties.  It is clear, however, that Naftel, Hayes' direct supervisor, became aware of Hayes' involvement in the lawsuit soon after coming to Merck in late 2002. Within six months of learning this information, Naftel placed Hayes in the PIP.  It is not clear when the other alleged harassing events occurred in relation to Naftel finding out about Hayes' involvement in the  Cabell case.

It appears that Hayes has established a *prima facie* case of retaliation, as it relates to the PIP and the constructive discharge.  The question now is whether Merck has provided a legitimate non-discriminatory reason for placing Hayes in a PIP and for allegedly constructively discharging him.

13

Merck maintains that the evidence shows that for years prior to Merck and Naftel finding out about the Cabell case, Hayes' job performance was substandard. In fact, Merck points to evidence that shows that Hayes' performance was substandard from the beginning. When Naftel decided to place Hayes in the PIP, Naftel states he had no firm plans to terminate Hayes. In fact, Neftal stated that at the time of Hayes' retirement, Hayes had not completed the extended PIP and that Naftel had not decided to terminate Hayes. Further, the whole purpose of the PIP is to provide a plan to help the employee to improve. Therefore, Merck has put forth a legitimate non-discriminatory reason for its actions.

The burden now shifts to Hayes to show that Merck's proffered legitimate non-discriminatory reason was a pretext for retaliation. Silvera v. Orange County School Board, 244 F.3d 1253 (11th Cir. 2001). Besides pointing to all of the above mentioned facts as evidence of pretext, Hayes produced a statement from at least one Merck employee that the majority of employees placed in a PIP are fired. The fact, along with the others, raises a substantial question of whether Merck's treatment of Hayes was in retaliation for participating in the class action lawsuit.

Therefore, the Court finds that Hayes has satisfied his burden of production by showing some evidence that Merck's actions were pretextual and that its conduct towards him was retaliatory. Further, Hayes has provided sufficient evidence to show that because of this alleged retaliation, his retirement could be found to be a constructive discharge. Hayes has presented sufficient facts upon which the fact finder could find retaliation. Accordingly, Merck's motion for summary judgment on Hayes' retaliation claim (Doc. No. 31) is **DENIED.**

**DUKES' RACE DISCRIMINATION CLAIM**

Dukes makes a claim that he was illegally discharged because of his race. Merck has moved for summary judgment on the claim.

To establish a *prima facie* claim of race discrimination, Plaintiff must show (1) that he is a member of a protected class; (2) that he was terminated ; (3) that he was treated differently

from a similarly situated employee; and (4) that he was qualified to do the job. Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). Merck must then put forth a legitimate, nondiscriminatory reason for the its actions. Walker v. Prudential Property and Casualty Ins. Co., 286 F.3d 1270, 1274-75 (11th Cir. 2002). The burden then shifts to Plaintiff to show that the articulated reason was merely a pretext for discrimination. Walker, 286 F.3d at 1275.

Merck maintains that Dukes has failed to establish a *prima facie* case and that it is entitled to judgment as a matter of law. Essentially, Merck argues that Dukes cannot establish that a similarly situated non-African-American was treated differently. In other words, Dukes has not established that a non-African-American engaged in substantially the same conduct and received more favorable treatment. Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1363 (11th Cir. 1999).

Dukes uses as comparators Matthew Skidmore (caucasian), Jackson Johnson (caucasian), Chris Pearson (caucasian) and Greg Lott (caucasian) as similarly situated employees that received more favorable treatment by Merck. Merck argues that each of the individuals are not appropriate comparators. Each, Skidmore, Johnson, Pearson and Lott, are not appropriate comparators because: (1) they had different jobs and job responsibilities; (2) their performance was not identical to Dukes [3]; and (3) they were not treated more favorably than Dukes. Further, Johnson was an hourly union employee while Dukes was a salaried employee.

Dukes also points to David Adcok (causasian) and Mark Grimaldi (caucasian) as comparators. These individuals are not appropriate comparators, Defendant contends, because: (1) they were not employed in the same department as Dukes; (2) they had different jobs with different job responsibilities as Dukes; (3) their job performance was not identical to Dukes' job performance; (4) they were not supervised by Johnson, Dukes' supervisor; and (5) they were not treated more favorably than Dukes.

---

[3]. Title VII requires that the comparator's job performance or misconduct to be "nearly identical" to that of the claimant. Williams v. Motoralla, Inc., 303 F.3d 1284, 1293 (11th Cir. 2002).

15

In his Brief, Dukes does not point to the above referenced employees as comparators, but his first line supervisors Patricia Johnson (caucasian) and co-worker John Fonderon (caucasian). Plaintiff does not discuss the other alleged comparators he identified in discovery in his Brief in opposition to Merck's motion for summary judgment.

According to Merck, Johnson and Fonderon are not similarly situated for numerous reasons. Fonderon is not similarly situated because: (1) Fonderon was employed in the water department, not waste management; (2) Fonderon's employment issues were not nearly identical to those of Dukes; and (3) Fonderon was not treated more favorably than Dukes. The key element is that Fonderon's jobs duties were much different than Dukes'. Dukes' primary responsibility was to sample and monitor the waste water samples, Fonderon did not deal with waste water. While Fonderon did have some problems with communication and timeliness, his technical performance was above the standard. Technical proficiency was one of Dukes' main performance issues. It was Dukes' failure to catch errors in tests under his review for which he was fired, not other job performance issues. Even though his technical skills were proficient, Fonderon was warned that if other job skills did not improve, he would be placed in a PIP.

Dukes' use of Johnson as a comparator is further misplaced as Johnson was the Supervisor of Environmental Laboratory and Dukes' apparent supervisor. Even so, Johnson was ultimately held responsible for the errors and permit violations made by Dukes and other employees. Johnson was initially counseled and nearly placed on a PIP because of the waste-water errors made by Dukes. Instead she was strongly counseled to discipline her employees more severely. When another permit related issue arose later, she was again counseled strongly to discipline her employees, such as Dukes, and a PIP was prepared for her. Before it could be implemented, she left work for a period of time because of a brain aneurism.

Based on the differences between the comparators and Dukes, the Court finds that Dukes has not shown that similarly situated employees were treated more favorably, as Dukes has not identified similar employees. Accordingly, Dukes has failed to establish a *prima facie* case of

discrimination.

Even if Dukes has established a *prima facie* case, he cannot show pretext. In addition to being counseled and placed on a PIP for lack of judgment, poor work performance, neglect of his duties, communication problems, and inability to perform his duties in a timely manner and without constant supervision, he was counseled for not catching errors in data. Dukes' primary job responsibility was as second-person reviewer of all lab results so that the lab results could be audited for environmental standards and permits. By not catching 84 errors during the previous year, he caused Merck serious problems with the environmental protection authorities. As a result and in addition to being placed in a PIP, Dukes was specifically told, "Any further mistake that is not caught by your second-person review, but found on review of your work will be grounds for immediate dismissal." During the PIP extension period, Dukes allowed seven errors to get by during his review of the data. Dukes was terminated soon thereafter.

The Court finds that Dukes has failed to carry his burden of showing that the reason he was terminated was a pretext for racial discrimination. Accordingly, Merck's motion for summary judgment on Dukes' claim that he was terminated because of his race (Doc. No. 31) is **GRANTED.**

### IV.  DUKES' RETALIATION CLAIM

The same standard that applied to Hayes' retaliation claim, *infra*, also applies to Dukes' claim of retaliation. To establish a *prima facie* case of retaliation, a plaintiff must show that (1) he engaged in protected speech; (2) he suffered an adverse employment action; and (3) there is a causal or temporal relationship between the two events. Pennington v. City of Huntsville, 261 F.3d 1262 (11th Cir. 2001).

Dukes filed a charge of discrimination with the EEOC in 1998, the Cabell lawsuit was filed in 2000, and a the dispute arose in 2001 over discovery issues in which Dukes filed an affidavit. Therefore, there is little doubt that Dukes was engaged in protected speech or conduct. Likewise, there is no dispute that Dukes' termination was an adverse employment

17

action. Merck maintains that Dukes has failed to establish a temporal connection or causal relationship between the protected activity and his termination.

First of all, there was more than a four year period between the initial charge of discrimination and Dukes' termination. Second, there was at least a two year interval between the other protected activity and his termination. These factors alone militate against a finding of temporal proximity between the events to infer a causal connection. "[W]here a substantial period of time has elapsed between the two events-engagement in the protected activity and the adverse employment action-the causal connection is less likely to exist absent evidence demonstrating a connection between the two events." Breech v. Alabama Power Co., 962 F.Supp. 1447, 1461 (S.D.Ala.,1997).

Aside from the amount of elapsed time between the events, Dukes' supervisor changed during this time. Before December 2001, Dukes' supervisor was Fonderon and Duke received very little criticism about his job performance. All of the protected activity occurred prior to December 2001. The law recognizes that intervening acts may destroy an inference of retaliation. Spence v. Panasonic Copier Co., 46 F.Supp. 2d 1340 (N.D. Ga. 1994). After December 2001, Johnson became Dukes' supervisor and the criticism of his work performance began. Further, the record does not reveal whether Johnson was even aware of Dukes' protected activity.

Therefore, the Court finds that Dukes has failed to carry his burden of establishing a *prima facie* case of retaliation. Accordingly, Merck's motion for summary judgment on Dukes claim of retaliation (Doc. No. 31) is **GRANTED.**

### V.  REMAINING DISPARATE TREATMENT CLAIMS

It is not clear from the complaint or from Plaintiffs' briefs if there are any remaining claims for disparate treatment. Merck, however, was concerned enough to move for summary judgment on said claims if they exist.

As with the previous claims for discrimination the same standards and analysis apply.

The pleadings could be interpreted as making claims for discriminatory treatment in terms of workload, discipline and placement on PIPs.  As pointed out by Merck, such claims fail to set out injuries that rise to the level of affecting a term or condition of employment.  The Eleventh Circuit has stated "the protections of Title VII simply do not extend to 'everything that makes an employee unhappy.' "  Davis v. Town of Lake Park, 245 F.3d 1232, 1242 (11th Cir. 2001).  Accordingly, such complaints, alone, are not actionable.  Therefore, to the extent such claims have been pled, Merck's motion for summary judgment on the remaining claims of disparate treatment (Doc. No. 31) is **GRANTED.**

## CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment (Doc. No. 31) is **GRANTED-IN-PART and DENIED-IN-PART.**

**SO ORDERED**, this   26th   day of September, 2006.

                                         /s/W. Louis Sands
                                         **W. LOUIS SANDS, JUDGE**
                                         **UNITED STATES DISTRICT COURT**